**Application of John E. EHRREICH and Donald Avery.**

**Appeal No. 78–561;
Serial No. 379,784.**

United States Court of Customs and Patent Appeals.

Jan. 11, 1979.

David G. Conlin, Sewall P. Bronstein, Donald Brown, Dike, Bronstein, Roberts, Cushman & Pfund, Boston, Mass., attorneys for appellants.

Joseph F. Nakamura, Washington, D. C., for the Commissioner of Patents; William H. Beha, Jr., Washington, D. C., of counsel.

Before MARKEY, Chief Judge, and RICH, BALDWIN, LANE and MILLER, Judges.

RICH, Judge.

This appeal is from the decision of the Patent and Trademark Office (PTO) Board of Appeals (board) affirming the rejection of claims 1–45, all of the claims in application serial No. 379,784, filed July 16, 1973, for reissue of U. S. Patent No. 3,583,930, entitled "Plastics Made Conductive With Coarse Metal Fillers." The board affirmed the examiner's rejection of all claims as obvious under 35 U.S.C. § 103. In addition, the examiner's rejection of claims 1–8, 12–24, 26–31, 33–36, 38–43, and 45 under 35 U.S.C. § 112 was sustained by the board. We reverse.

*The Invention*

Appellants' invention pertains to improved electrically-conductive coatings, gaskets, and caulking compounds useful for waveguide assemblies, weathertight R.F. (radio frequency) enclosures, and other applications requiring environmental sealing and electromagnetic radiation (EMR) shielding. A compressible or resilient plastic material is loaded with silver-coated metal particles which are held in electrically-conductive, metal-to-metal contact by the plastic binder or matrix. Appellants' improvement resides in their discovery that high-volume loadings of the plastic material, in the order of 35 to 80 volume percent, utilizing large particles (0.5 to 40 mils) having a high surface area per unit volume, i. e., between 450 to 200,000 square feet/cubic foot, results in a product having high conductivity, and, hence, good EMR shielding capability. The invention may be better understood from an examination of claims 1, 9, and 12, the only independent appealed claims. Claim 12 is the broadest claim:

12. In an electromagnetic energy shield having a volume resistivity to be effective as an electromagnetic shield comprising a resin matrix loaded with particles coated with silver in an amount of about 40 to 80 volume percent, the improvement being that the silver coated particles are of a maximum size in the range of from 0.5 to 40 mils and wherein the resin in [sic] compressible.

Claim 1 is the same except for being limited to an EMR shield "in the form of a gasket or caulking compound." Claim 9 is limited to an EMR shield in the form of a gasket wherein the particles are spherical:

9. An electromagnetic energy shield in the form of a gasket having a volume resistivity to be effective as an electro-

magnetic energy shield comprising a compressible resin matrix loaded with substantially spherical particles coated with a layer of silver and ranging in size from 0.5 to 40 mils.

## The Prior Art

The following references were cited by the examiner and relied on in various combinations to support the rejection of the claims under § 103:

| | | | |
|---|---|---|---|
| Wood | 2,313,379 | March | 9, 1943 |
| McGrath | 2,506,728 | May | 9, 1950 |
| Coleman et al. | 2,771,380 | Nov. | 20, 1956 |
| Price | 3,030,237 | April | 17, 1962 |
| Ueda | 3,083,169 | March | 26, 1963 |
| Hunter | 3,099,578 | July | 30, 1963 |

Cuming, W. R., "Materials for R. F. Shielded Chambers and Enclosures," Symposium Digest, 4th National Symposium on Radio Frequency Interference, June 28–29, 1962.

Ueda discloses thermally and electrically-conductive plastics made by mixing a water-soluble phenolic resin with ultra-fine (approximately 0.1 μ) powders of carbon in combination with similarly sized powders of various metals. His normally hard product may be made flexible by the addition of polyvinyl alcohol to the phenolic resin mixture. Ueda states that the superior conductivity of his composition is due largely to the presence of the water in the phenolic mixture. In that way, Ueda claims to overcome the prior art dilemma of how to increase conductivity without adverse effect on mechanical properties caused by addition of too large a proportion of conductive particles in the compositions. Otherwise, he is silent as to the amount of powdered mixture to be added to the resin.

Hunter discloses an electrically conductive, heat-producing coating composition made from finely powdered (particle size less than 4 mils) conductive substances, viz., carbon, silver iron, in combination with a flexible resin, wherein the concentration of the powdered conductive component is between 22–53% by volume. It is disclosed as having a resistance sufficient to enable its use as a heating element. Hunter teaches that a mixture of finely powdered carbon, granular silver, and granular iron particles must be used, and that the granule form of metal particles is superior to the flake form. In Example X, Hunter teaches that when the concentration exceeds 53% the coating becomes deficient in mechanical properties such as adherence and flexibility.

Coleman et al. disclose a method of coating copper particles with silver. The particles to be coated may be as large as 40 mils, and Coleman et al. state that such particles may be used in applications calling for electrically-conductive compositions or paints. The disclosure is not limited to any particular particle shape.

Wood discloses a thermally and electrically-conductive sponge rubber composition, used as a heat dissipator or electrostatic shield, in a mounting for electrical components. Particles, preferably in "fine dust" form (no size range is specified), are added to the sponge rubber in an amount determined by the degree of conductivity desired. Wood states that there is "no definite upper limit" to the amount of conductive material which may be added to the rubber and suggests he may use "50% or even more" but discloses no more than 20% by weight of powdered aluminum in any composition which he has "used successfully."

Price discloses the use of substantially spherical particles of gold, silver, copper, or aluminum in combination with flake-type particles of the same materials in conductive resinous coatings. The maximum particle size taught is approximately 44 microns, and Price directs that specified portions of the two different shapes of particles must be used to achieve the desired result.

McGrath discloses a conductive sealing compound for metal joints which sets or vulcanizes when the surfaces to which it has been applied are heated by spot-welding. The compound is made conductive by inclusion of iron or copper filings, carbon black, and the like. The vulcanized composition forms a substantially gas and liquid-impervious seam or joint.

*Symposium Digest* discloses that silver-coated particles can be added to plastic binders to make gaskets and caulking compounds with good R.F. shielding properties. Only the use of "finely divided" particles (size unspecified) is discussed, and no ingredient portions are given.

## The Rejections

### 35 U.S.C. § 112

Appellants' problems under § 112 stem from the language in claims 1 and 12 which define the particle size as being "of a maximum size in the range of from 0.5 to 40 mils." The board agreed with the examiner that this language defined only the largest particles and did not define the lower limit of particle size. Although the board opinion is not explicit, we read it as affirming the examiner's rejection under both paragraphs 1 and 2 of § 112.[1] Since the specification discloses the *necessity* of using *coarse* particles, this interpretation of the language of claims 1 and 12 causes the specification to be at variance with the claims, resulting in the rejection under paragraph 2 of § 112 as not being what applicants regard as their invention. In addition, this language makes the claims read on the ultra-fine prior art particles and results in a rejection under paragraph 1 of § 112 as broader than the specification—i. e., lacking support therein.

### 35 U.S.C. § 103

The rejections under 35 U.S.C. § 103 were made by considering the claims in three groups. The group I claims, drawn to a shield in the form of a gasket or caulking compound, comprising claims 1–3, 7, 12–15, 17, 21–22, 25, 30–31, 33–36, 39, 41, and 45, were rejected as obvious from Ueda or Hunter in view of Coleman et al. and Wood. The examiner reasoned that, in view of the teachings of Ueda and Hunter that electri-cally-conductive plastic materials could be made from silver particles:

It would be obvious to replace the silver particles of Ueda or Hunter with silver coated copper particles since Coleman et al., teaches [sic] using such particles in conductive compositions and that such compositions will have superior conductivity. Wood teches [sic] that when metal particles are dispersed in rubber there is no upper limit on the amount of metal that can be added, the amount chosen depending on the conductivity desired. In view of Wood it would be obvious to one skilled in the art to choose a volume percent depending on the conductivity desired.

The group I claims were also found obvious from *Symposium Digest* in view of Wood. The examiner's rejection was simply stated in these words:

5. Claims 1–3, 7, 12–15, 17, 21–22, 25, 30–31, 33–36, 39, 41 and 45 are rejected as being unpatentable over Symposium Digest in view of Wood under 35 U.S.C. 103. Symposium Digest discloses that silver coated copper particles can be added to plastic to make either a gasket or caulking compound with good R.F. shielding properties. Wood teaches that in adding metal particles to rubber there is no upper limit on the percent added, the amount added depending on the conductivity desired. In view of Wood [it would be] obvious to choose the volume percent as desired.

The group II claims, drawn to compositions utilizing spherical particles, were rejected as obvious from Ueda or Hunter in view of Coleman et al. and Wood for the same reasons given for the group I claims, and further in view of Price, who teaches use of spherical silver particles. According to the examiner:

3. Claims 4–6, 8–11, 16, 18–20, 23–24, 26–29, 32, 37–38, 40, 42–44 are rejected as

---

1. The board stated:

The specification clearly sets a lower and upper limit for the suitable particle size. The claims before us read on particles having a size less than 0.5 mils *and accordingly, do not claim what appellants regard as their invention and are broader than the specification.* [Emphasis ours.]

The emphasized portion of the board's statement effectively sets out rejections under both paragraphs 1 and 2 of § 112.

being unpatentable over either Ueda or Hunter in view of Coleman and Wood for the same reason as stated \* \* \* [above] and further in view of Price under 35 U.S.C. 103. In a conductive coating Price teaches that silver particles can be used in the form of spheres. See column 1, lines 1–2, 59–61; column 2, line 9. In view of Price it would be obvious to use spheres as Coleman et al's particles.

Applicant's [sic] arguments with respect to Price are not at issue since it is solely being used to teach a particular particle shape.

In addition, the group II claims were rejected as obvious from *Symposium Digest* in view of Wood and further in view of Price for the same reasons as stated above.

The group III claims, drawn to compositions using spherical particles and formed into gaskets, comprising claims 9–11, 25–29, 37, and 43, were rejected as obvious from Ueda or Hunter in view of Coleman et al., Wood, and Price, for the same reasons as stated above, and further in view of McGrath, who teaches that conductive compositions comprising metal particles and resin can be formed into compressible gaskets.

In agreeing with the examiner, the board merely adopted the reasons of the examiner as its own after commenting further on the significance of the primary references. It was noted that while not all of the references discuss the EMR shielding capabilities of the disclosed compositions, those capabilities would, be inherently expected of such compositions. Appellants were criticized for arguing the references separately rather than collectively, as used in the rejections, for what they would suggest to those of ordinary skill in the art.

2. The examiner stated in his final rejection:
    (B) Claims 1–45 are rejected as failing to particularly point out and distinctly claim what applicants regard as their invention under 35 U.S.C. 112 (paragraph 2). At pages 3 and 4 of the specification, applicants cite prior art use of finely divided particles and state that the instant invention lies in the use of coarse particles (which by definition are

## OPINION

### The § 112 Rejections

Preliminarily, we note that the rejection under the second paragraph of § 112 is predicated on a comparison of the claims with the specification. The examiner and the board held that since, in their opinion, the claims did not recite the lower particle size limit which the specification disclosed as critical to the invention, appellants had failed to particularly point out and distinctly claim the subject matter they regarded as their invention.[2] We cannot accept this reasoning.

■ The second paragraph of § 112 pertains *only* to claims. *In re Borkowski*, 422 F.2d 904, 909, 57 CCPA 946, 951, 164 USPQ 642, 645 (1970). Agreement, or lack thereof, between the claims and the specification is properly considered only with respect to the first paragraph of § 112; it is irrelevant to compliance with the second paragraph of that section. The PTO approach to the § 112 rejection in this case is strikingly similar to the approach taken by the examiner in *Borkowski*, supra, which we disapproved. As we said in *Borkowski* (422 F.2d at 909, 57 CCPA at 952, 164 USPQ at 646–47):

The examiner's approach to determining whether appellants' claims satisfy the requirements of § 112 appears to have been to study appellants' disclosure, to formulate a conclusion as to what he (the examiner) regards as the broadest invention supported by the disclosure, and then to determine whether appellants' claims are broader than the examiner's conception of what "the invention" is. We cannot agree that § 112 permits of such an approach to claims. The first sentence of

large particles). See also page 13, example 3. As such, since claim 1 is readable on very fine particles (i. e. no minimum size), it does not define what applicants regard as their invention. The claim merely states a maximum size range from 0.5 to 40 mils but there is no inclusion of a minimum size range. For the board's reasoning, see note 1, supra.

the second paragraph of § 112 is essentially a requirement for *precision and definiteness* of claim language. If the scope of subject matter embraced by a claim is clear, and if the applicant has not otherwise indicated that he intends that claim to be of a different scope, then the claim does particularly point out and distinctly claim the subject matter which the applicant regards as his invention. That is to say, if the "enabling" disclosure of a specification is not commensurate in scope with the subject matter encompassed by a claim, that fact does not render the claim imprecise or indefinite or otherwise not in compliance with the *second* paragraph of § 112; rather, the claim is based on an *insufficient disclosure* (§ 112, first paragraph) and should be rejected on that ground. * * [citations] Thus, just as a claim which is of such breadth that it reads on subject matter disclosed in the prior art is rejected under § 102 rather than under the second paragraph of § 112, a claim which is of such breadth that it reads on subject matter as to which the specification is not "enabling" should be rejected under the first paragraph of § 112 rather than the second. We do not intend hereby to suggest that rejections under § 112 must be labeled "first paragraph" or "second paragraph." What we do suggest is that it should be made clear exactly which of the several requirements of § 112 are thought not to have been met. Is the claim unclear or is the specification's disclosure inadequate to support it? [Emphasis in original; footnotes omitted.]

■ Since this rejection is not based on indefiniteness or lack of clarity of claim language, but only on the alleged lack of agreement with the scope of the specification, we reverse it as having been improperly made. We therefore treat the rejection

under § 112 as one made only under the first paragraph thereof. We will not sustain it.

■ Because we read the claims as setting forth a minimum particle size limitation, we hold that the examiner and the board erred in finding no such limitation recited. There are several reasons for our conclusion.

■ Claim language is to be given its broadest reasonable interpretation in light of the specification. *In re Okuzawa*, 537 F.2d 545, 548, 190 USPQ 464, 466 (Cust. & Pat.App.1976); *In re Royka*, 490 F.2d 981, 180 USPQ 580 (Cust. & Pat.App.1974). The limitation at issue requires that "the silver coated particles are of a maximum size in the range of from 0.5 to 40 mils." The examiner and the board noted that the specification explicitly teaches the necessity of using coarse particles to make the compositions, and clearly states that the minimum particle size used is 0.5 mil. Both, however, interpreted the words "maximum size in the range of 0.5 to 40 mils" to mean that the largest of the particles should be in the range recited and concluded that no lower limit for particle size was recited.

We think it highly unlikely that one skilled in the art would construe the term "maximum size" as used in this context in the manner suggested by the PTO. Appellants have brought to our attention that the very art cited by the PTO in making the § 103 rejections makes clear that those skilled in the art routinely measure the sizes of irregularly-shaped particles, to which the rejected claims are drawn, by reference to the particle's largest dimension.[3] In our opinion, one skilled in the art having the specification in mind would read the claim language as defining both an upper and lower limit on particle size. The

---

3. Price states:

First, I find that the *size or maximum dimension* of all pigment particles should be approximately 44 microns (0.0017″) * * *. [Emphasis ours.]

Hunter states:

* * * the granules should be less than about 100 microns in *maximum dimension* and preferably smaller. [Emphasis ours.]

Coleman states:

The method has been used with success with particles which range in size from about one millimeter to a few microns in their *maximum dimension*. [Emphasis ours.]

specification explicitly states that the preferable *maximum particle size* is 40 mils and that the *minimum particle size* used is 0.5 mil. These *same* values are used in the claims, which recite a size *range*—a concept which most readily makes sense, especially in light of the specification, if viewed as setting forth *both* an *upper* and *lower* limit.[4]

In addition, the PTO, with respect to identical language in the original claims for which reissue is sought here, refused a request for a certificate of correction which had been sought to remove the word "maximum" from the claims. The request was denied on the recommendation of the Group Director, who stated:

> The proposed change would materially affect the scope of the claims. *The term "maximum" is used with the term "size" and referes [sic] to the maximum dimension of an irregularly shaped particle.* Applicant points out that maximum was not used in claim 9 but in claim 9 the particle was defined as "substantially shperical" [sic]. [Emphasis ours.]

Thus the PTO has led appellants to believe that their claim language would be given a particular construction by refusing to allow them to remove the very w,ord which it now asserts renders the claims fatally deficient under § 112. The solicitor argues that appellants' construction of the claims at issue under § 112 would literally read out the word "maximum." He contends that appellants had ample time during prosecution to amend their claims to remove the word but chose not to do so, and now must take the claims as they now read. We agree that appellants must take their claims as they now read, but we are of the opinion that appellants' interpretation of the claims is the more reasonable. Appellants had no reason to wish to amend their claims until

the PTO changed its mind regarding interpretation of appellants' claim language. Therefore, the decision of the board affirming the rejection under 35 U.S.C. § 112 of claims 1–8, 12–24, 26–31, 33–36, 38–43, and 45 is reversed.

### The § 103 Rejections

■ We will reverse all of the rejections under § 103 based upon *Symposium Digest* combined with Wood. As noted by the board, *Symposium Digest* "describes silver coated copper particles which may be used to form coatings, gaskets or caulking compositions. Symposium *does not define the size of the particles and does not describe the ratio of particles compared to binder*." (Emphasis ours.) By disclosing that the metal is preferably in the form of a "fine dust," Wood teaches away from the claimed particle size. What Wood *does* disclose is that he had successfully used compositions including 20% *aluminum by weight*. When it is considered that the claimed *silver-coated particles* are heavier than *aluminum particles*,[5] and that the *weight percent* disclosed by Wood becomes a smaller *volume percent* than that recited in the claims, we agree with appellants that Wood does not teach appellants' volume loadings. Furthermore, we regard Wood's statements that proportions by weight-percent of "50% or even more may be used," and that "there is no definite upper limit for the powdered metal filler," as pure speculation which would be ignored by those skilled in the art in view of the later teachings of Ueda and Hunter that high particle loadings have a deleterious effect on the mechanical properties of the compositions and are to be avoided. *Cf. In re Oelrich*, 579 F.2d 86, 91, 198 USPQ 210, 214 (Cust. & Pat.App.1978). We must not here consider a reference in a vacuum, but against the

---

**4.** One skilled in the art, with knowledge of the technique for measuring irregularly-shaped particles, would interpret the term "maximum size" as recited in the claims to relate to the measurement technique, and would apply it to define an upper and lower limit for particle size. Viewed in this light, the claims call for the particles to have a maximum "maximum

dimension" of 40 mils and a minimum "maximum dimension" of 0.5 mil.

**5.** Appellants disclose the use of nickel, lead, zinc, cadmium, and copper particles. Volume for volume, all of these particles are heavier than aluminum particles by virtue of their greater atomic weight.

background of the other references of record which may disprove theories and speculations in the reference, or reveal previously undiscovered or unappreciated problems. The question in a § 103 case is what the references would *collectively suggest* to one of ordinary skill in the art. *In re Simon*, 461 F.2d 1387, 56 CCPA 1140, 174 USPQ 114 (1972). It is only by proceeding in this manner that we may fairly determine the scope and content of the prior art according to the mandate of *Graham v. John Deere Co.* 383 U.S. 1, 17, 86 S.Ct. 684, 15 L.Ed.2d 545, 148 USPQ 459, 467 (1966). Therefore, combination of *Symposium Digest* with Wood would not have rendered obvious the particle size limitation or the particle volume-percent limitation, and certainly not the subject matter *as a whole* which encompasses these limitations. *Cf. In re Hirao*, 535 F.2d 67, 69, 190 USPQ 15, 17 (Cust. & Pat.App.1976); *In re Prater*, 415 F.2d 1393, 56 CCPA 1381, 162 USPQ 541 (1969).

Our review of the record also convinces us that the prior art relied upon by the examiner and the board does not support a holding of obviousness under § 103 using the proposed art combinations to reject the group I claims. As we stated in *In re Kuderna*, 426 F.2d 385, 57 CCPA 1078, 165 USPQ 575 (1970):

> We must approach the issue of patentability in terms of what would have been obvious to one of ordinary skill in the art at the time the invention was made in view of the *sum* of all the relevant teachings in the art, not in view of first one and then another of the isolated teachings in the art.

We must consider the entirety of the disclosure made by the references, and avoid combining them indiscriminately. *In re Rinehart*, 531 F.2d 1048, 189 USPQ 143 (Cust. & Pat.App.1976).

The rejections all rely on the crucial combination of Ueda or Hunter with Wood. As we have explained, we do not accept the speculations of Wood regarding the unlimited volume loadings. We are of the opinion that, when taken in their entireties, Ueda or Hunter, in combination with Wood, do not suggest the claimed compositions.

The board has noted that Ueda fails to teach the claimed particle size, volume loadings, or use of silver-coated particles. Although it may be argued that Hunter may be used to teach appellants' claimed volume loadings,[6] we decline to apply it in this manner. Neither the examiner nor the board, having Hunter before them, suggested that the reference teaches this limitation, relying instead solely on Wood. Hunter's concern with providing a fixed resistance property in his compositions, and his warning that the *"definite relationship* between the proportions of binder and each of the three particulate materials \* \* \* *must be observed"* (emphasis added) in order to provide mechanically-stable coating compositions possessing, inter alia, the property of flexibility, would, we think, have prevented one of ordinary skill in the art from finding any suggestion in Hunter that a single type of conductive particle could be included in the claimed volume concentrations to form a composition having a high enough conductivity (low enough volume resistivity) "to be effective as an electromagnetic shield." In this respect, appellants are addressing a different problem than did Hunter, a factor which must be considered in evaluation of Hunter as a reference. Thus, the subject matter as a whole would not have been obvious from the references. *In re Hirao* and *In re Prater*, supra.

The solicitor has noted that claims 1 and 12 are in *Jepson* format (*Ex parte Jepson*, 1917 C.D. 62, 243 O.G. 526) and asserts that appellants impliedly admit that the subject matter recited in combination in the preamble (i. e., up to "the improvement being") is old in the art. We agree that the preamble elements in a *Jepson*-type claim are *impliedly admitted* to be old in the art, 37

---

**6.** In his brief, the solicitor notes that Hunter does disclose conductive particles "in volume concentrations of between 22 to 53%," but nowhere argues that this suggests appellants' claimed volume loadings. Like the board and the examiner, we find this fact to be of little significance in light of the references considered in their entireties.

CFR 1.75(e) (1978); see also *In re Aldrich*, 398 F.2d 855, 857, 55 CCPA 1431, 1434, 158 USPQ 311, 312 (1968), but it is only an *implied admission*. The fact that none of the art cited by the examiner shows the combination recited in the claim preambles gives credence to appellants' explanation for drafting the claims in *Jepson* format, which was not intended as an admission, but was to avoid a double patenting rejection in a co-pending case unavailable to the public. We think that a finding of obviousness should not be based on an implied admission erroneously creating imaginary prior art. That is not the intent of § 103. We will not use appellants' claim preamble as prior art against them in this situation.

Thus, we are directed to no combination of prior art references which would have rendered the claimed subject matter *as a whole* obvious to one of ordinary skill in the art at the time the invention was made. The PTO has not shown the existence of all of the claimed limitations in the prior art or any suggestion leading to their combination in the manner claimed by appellants.

The remainder of the rejections concerning claim groups II and III, relying as they do on the erroneous combination set forth above, are likewise in error. In view of the foregoing, the rejections of claims 1–45 as obvious under 35 U.S.C. § 103 are *reversed.*

REVERSED.

BALDWIN, Judge, concurring.

I am in full agreement with the result reached in the majority opinion.

I must strongly disagree with the suggestion that rejections under the second paragraph of § 112 are somehow limited only to a consideration of whether or not the claims are vague. Extrinsic evidence will sometimes prove that an applicant is not "claiming the subject matter which [he] * * * regards as his invention." *In re Prater*, 415 F.2d 1393, 56 CCPA 1381, 162 USPQ 541 (1969).

This court has specifically countenanced such rejections:

If the scope of subject matter embraced by a claim is clear, *and if the applicant has not otherwise indicated that he intends that claim to be of a different scope*, then the claim does particularly point out and distinctly claim the subject matter which the applicant regards as his invention. [Emphasis ours.]

*In re Borkowski*, 422 F.2d 904, 909, 57 CCPA 946, 952, 164 USPQ 642, 645–646 (1970).

An assessment of *all of the evidence* in this case leads me to the conclusion that appellants are claiming their invention. The examiner argued that the lack of a lower limit to the pigment size in the claims "made the claims readable on fine particles" and since the specification states "that the instant invention lies in the use of coarse particles," appellants do not claim the subject matter they regard as their invention. I disagree.

Each of the independent claims requires that the composition be an "electromagnetic energy shield." The specification reveals that a composition in which the metal particles have insulating films of, e. g., the plastic matrix, does not operate as "electromagnetic energy shield." The specification further states that the *finely*-divided pigment particles in the prior art composition will have "insulating layers of resin * * * between the contiguous particles." Accordingly, the claims do not include subject matter outside the scope of appellants' view of their own invention in spite of absence of the lower limit. See *In re Mayhew*, 527 F.2d 1229, 188 USPQ 356 (Cust. & Pat.App. 1976) (concurring opinion).