54 CCPA

Application of Marvin C. VAN WANDER-HAM, Warren W. Worthley and Carl R. Comolli.

Patent Appeal No. 7781.

United States Court of Customs and Patent Appeals.
June 15, 1967.

Gerald E. Smallwood, John B. Farmakides, Washington, D. C., for appellants.

Joseph Shimmel, Washington, D. C. (Jere W. Sears, of counsel), for the Commissioner of Patents.

Before WORLEY, Chief Judge, RICH, SMITH and ALMOND, Judges, and WILLIAM H. KIRKPATRICK.*

SMITH, Judge.

The issue presented is whether, in view of the facts of record, appellants' invention relating to cryogenic liquid systems, is obvious within the meaning of 35 U.S.C. § 103. The real party in interest, by virtue of an assignment, is the National Aeronautics and Space Administration.

All three of the appealed claims were considered together. Appealed claim 22 describes a cryogenic liquid system as follows:

22. In a rocket propelled missile booster cryogenic liquid propellant flow system for uniformly supplying a cryogenic liquid propellant from a propellant storage tank to the combustion chamber in said rocket engine with minimal delay and waste of said fluid in stabilizing said uniform flow, the combination comprising:

1. conduit means for containing and directing the flow of said cryogenic liquid propellant from said tank to said rocket engine combustion chamber;

2. a thin substantially uniform layer of thermal insulating plastic material on the internal surfaces of said conduit means in contact with said cryogenic liquid propellant flowing therethrough;

3. means for producing and maintaining the flow of said cryogenic liquid propellant from said tank to said combustion chamber of said rocket engine;

4. whereby, the flow of said cryogenic liquid propellant from said tanks to said rocket engine combustion chamber is stabilized.

At the onset there is a dispute between the parties as to what precisely is appellants' invention. For reasons developed more fully hereafter, the Patent Office terms the invention as "means to accelerate cooling of a metal by a liquid" while appellants argue it is a "cryogenic liquid propellant flow system" for missiles. No objection was made by the Patent Office as to the form of the claims or that they fail to meet the requirements of 35 U.S.C. § 112 in particularly pointing out and distinctly claiming the subject matter which

* Senior District Judge, Eastern District of Pennsylvania, sitting by designation.

appellants regard as their invention. There is, therefore, no issue here as to whether the appealed claims define appellants' invention, in accordance with section 112. Accordingly, appellants' invention is the subject matter set forth in the appealed claims.

A second dispute arises between the parties as to what teachings were "prior art" at the time appellants made their invention. The Patent Office, in discharging its burden to show that the invention is obvious within the meaning of section 103, argues the prior art includes certain alleged admissions by appellants in their specification and the following article:

> Sato, On the Effect of "Facing" on the Cooling Velocity of a Specimen During Quenching, 295th Report of the Research Institute for Iron, Steel and Other Metals, 21 Science Reports 565–74 (No. 4 1932).

We will first consider the disclosure in Sato. This article states:

> A method of quenching, which has been the practice of Japanese cutlery makers for a long time, is to face the surface of the specimen to be hardened with a mixture of "tonoko" i. e. the very fine powder of a razor whetstone and water, and to dry the specimen prior to the quenching operation. This process is said to be absolutely indispensable to obtain a perfect hardening. Since "tonoko" is powdered clay slate and a bad conductor of heat, a coating of this material even though a very thin layer, may at first be thought to have the effect of preventing the quick cooling of the specimen. * * * it was confirmed [by tests] that the velocity of cooling is much greater in the case of a faced than in that of an unfaced specimen, and that the slow cooling in the latter case is caused by the vapour film which forms on the surface of the specimen during the first period of immersion in the cooling liquid.

Sato discloses quenching specimens, the surface of which is roughened "to obtain a firm adhesion for the facing material." This is referred to "as the standard surface condition, whether faced or unfaced, for quenching." Sato concludes:

> The present investigation may be summarized as follows:
>
> (1) By comparing cooling curves during quenching * * * it was ascertained that a more drastic and uniform quenching may be effected in the case of specimens with facing than in the case of those without facing.
>
> (2) An unfaced specimen heated to a high temperature, is, when quenched, at once covered with a vapour envelope given off by the cooling medium, and as the vapour is a bad conductor of heat, the cooling of the specimen is thereby greatly retarded, until the envelope begins to break and a direct contact of the specimen with the cooling medium takes place; then an abrupt increase in the cooling velocity which is indicated by a break in the temperature-time curve results.
>
> (3) Faced specimens are never enveloped by vapour film and, therefore, their cooling is very rapid and uniform throughout the specimen. Thus, the old technique of quenching steel specimens with facing is very useful; it gives them an intense and uniform hardening.

In addition to the teachings of Sato, the examiner relied on statements in appellants' specification as establishing facts which were known to those of ordinary skill in the art at the time the invention was made. Appellants stated:

> In a cryogenic, that is extremely low temperature, liquid containing and flow system such as the rocket fuel supply system shown in Fig. 1, it is essential to cool down or lower the temperature of the cryogenic liquid containing and flow defining walls as rapidly as possible so as to stabilize the flow of cryogenic liquid to such apparatus as rocket thrust chambers and thereby stabilize the operation of such apparatus as rapidly as possible.

In the past, efforts have been made to accelerate this wall cool-down time including the proper selection of cryogenic fluid and wall metal, providing heat conducting layers therebetween and so forth but none have been acceptable. * * *

Appellants discuss in the specification their invention as follows:

* * * applicants * * * have found that a marked improvement is obtained in cryogenic fluid chamber wall cool-down when an insulating layer is applied to the inner surface of the walls and that optimum efficiency is obtained when the insulating layer covers the entire wall inner surface. It has been found that the film boiling which was present in the past between the wall metal and the cryogenic liquid is prevented from becoming established by the use of this insulating layer and that a nucleate boiling is established in its place. This nucleate boiling allowed better heat transfer than the insulating film boiling between the cryogenic liquid and the walls which occurred when insulation was not used. This film seriously impeded the absorption of heat from the metal walls by the cryogenic liquid. The insulating layer, by the establishment of nucleate boiling, permits some of the cryogenic liquid to be in contact with the wall metal at all times, even though bubbles are leaving the surface, and thereby accelerates heat transfer between the wall metal and the cryogenic liquid.

* * * * * *

Those skilled in the art will realize that the aforementioned film boiling and other flow instabilities will cause pump cavitation and that it is therefore highly important to prevent film boiling and to establish cryogenic fluid flow stability as rapidly as possible. As stated above, we have found that the inner surface insulating layer accelerates this metal wall cooling process and prevents film boiling by substituting nucleate boiling therefor.

The examiner's view, in summary, was as follows:

* * * In appellants' disclosure the cooling medium is a liquid and the article to be rapidly cooled is the fuel or oxydizer system. In the Sato publication the cooling medium is the liquid in which the cutlery is quenched and of course the cutlery is the article to be cooled. The analogy is very close The art to which both the reference and the claims relate is that of heat exchange. * * *

* * * * * *

It is desired to point out that the problem was recognized as one of heat exchange. This is deemed quite obvious. Then, how the problem was to be solved was the next step. And with the Sato publication before them appellants would naturally come to the solution. There is no difference of arts such as fuel containing system cooling and metal tempering. Both the alleged invention and the reference relate to the same art, heat exchange.

The solicitor adds, the problem was known and "researching * * * [the] problem might well have led to Sato's article, or the longstanding practice of Japanese cutlery makers analyzed therein." According to the solicitor:

* * * In short, a successful overall missile depends upon cooperation among experts having different skills. Wouldn't it have been only common sense, then, for persons with appellants' problem to have consulted their colleagues skilled in metallurgy and heat exchange, particularly since it was known that accelerated cooling of the metal tubing would provide the answer?

To these colleagues, rapid cooling of metal by a contacting liquid would suggest quenching of steel. A thorough investigation of available literature on this subject would have uncovered the Sato article and readily revealed its pertinence, assuming it was indexed according to its title or

abstracted according to its synopsis. Then too, mightn't a modern day armorer, steeped in guided missile technology, nevertheless recall an old sword maker's expedient, where perfect hardening of the blade is known to depend on rapid quenching?

We will now turn to a consideration of appellants' arguments. First, it is argued:

\* \* \* The Board has mistakenly taken the Appellants' brief description of their invention as a statement of prior art. It is clear that the Appellants are showing how the problem of propellant flow stabilization was being approached by them. There would appear to be other ways to approach this problem of flow instability such as an additive to be mixed with cryogenic propellant which would prevent the pump cavitation problems. Possibly a new type of pump would provide the answer. Possibly even great pressurization on the entire system would be the solution.

Suffice it to say here that the Appellants felt that the problem was caused by a high momentary heat transfer from the conduits to the liquid cryogenic fluid which vaporized some of the liquid. They found that it was this vapor which caused the trouble. They even found that the vapor formed inside the propellant pumps and the formation of the vapor caused the pumps to cavitate which in turn caused large variations in the propellant flow rate to the combustion chamber. \* \* \*

Appellants submitted the affidavits of two "Aerospace Technologist[s]" which alleged, in substance:

That it has for many years been a problem, with which he has been concerned, to develop a propellant flow system which will uniformly supply a cryogenic liquid propellant from a storage tank to the combustion chambers of rocket engines;

That he believes in excess of 1000 technical persons in government and with industries in this country have, in the past 20 years, been interested in a solution of this problem and have actively worked toward such a solution;

That not until the Applicants' solution to this problem has a simple and straightforward solution thereof been found;

Appellants disagree that the problem was "known":

\* \* \* The problem which was "known" to the Board was one which was taught by Appellants' specification and which the Examiner said was "obvious" from the flow stabilization problem which faced both the affiants and the Appellants. The Appellants contend that the problem of reducing the quantity of vaporized propellants from the cryogenic propellant system was neither obvious nor was it known.

As we view the reasoning advanced by the Patent Office, the examiner was of the opinion that there was no issue as to the availability of Sato under section 103. In his view, the "person having ordinary skill in the art" would be one skilled in heat transfer and appellants' "invention" would be obvious to him once the Sato article was called to his attention. The board agreed with the examiner. The solicitor, on the other hand, appreciated the technological differences between the subject matter here claimed and the teachings of Sato. According to the solicitor, the invention relates to a cryogenic liquid propellant flow system and the issue here is whether appellants would be expected, in view of section 103, to turn to the art of quenching steel. As stated in the solicitor's brief:

\* \* \* That is the real question here, in line with the test for analogous arts stated in In re Lobl, 43 CCPA 734, 228 F.2d 234, 108 USPQ 229, and In re Shapleigh, 45 CCPA 705, 248 F.2d 96, 115 USPQ 129.

In *Lobl* the invention related to a flexible closure for a container and one of the references relied on under section 103 related to a door buffer. In holding that the latter reference was in nonanalogous art, we stated: "It does not seem likely to us that one seeking to produce an improved closure for containers would look to the door buffer art for suggestions." 228 F.2d at 237, 43 CCPA at 738. In *Shapleigh* the invention related to a tube-type reaction furnace having outer and inner tubes suitable for catalytic or non-catalytic treatment of hydrocarbons. One reference related to an apparatus for manufacturing alkali cyanid having outer and inner tubes and a second reference related to an apparatus for cracking hydrocarbons. The court found the reference teachings to be pertinent under section 103, citing *Lobl*.

Here, as in In re Grout, 377 F.2d 1019, 54 CCPA ——, two aspects of the requirements of section 103 are presented for our consideration: first, what is the invention as a whole for which the patent is sought; and second, who is the person of ordinary skill in this art. As pointed out, supra, we find appellants' invention to be a cryogenic liquid propellant flow system.

■ The second aspect of section 103 is not easily resolved. Appellants are of course not charged with the teachings in all arts. Where is the dividing line? The Supreme Court in Potts v. Creager, 155 U.S. 597, 15 S.Ct. 194, 39 L.Ed. 275 (1895), applied the doctrine of nonanalogous art to references cited therein in upholding the validity of the patents in suit. According to the Court's opinion, 155 U.S. at 606, 15 S.Ct. at 198:

What, then, did the patentees do? They took the cylinder shown in the Creager wood-polishing exhibit, removed the glass bars, and substituted bars of steel, provided it with an abutting surface in the form of a revolving roller, and used it for a totally distinct and different purpose. * * *

In *Potts* the reference related to a wood polishing machine and the invention related to a machine "to disintegrate and pulverize" clay. The doctrine of nonanalogous art was subsequently applied in Hobbs v. Beach, 180 U.S. 383, 21 S.Ct. 409, 45 L.Ed. 586 (1901), citing *Potts*.

This court had occasion to comment on *Potts* in In re Kylstra, 87 F.2d 487, 24 CCPA 938. It held that while a street car register may be nonanalogous to a machine gun ammunition counter, the *invention* related to the *counting* art. Consequently, "the patentability of appellant's device must be tested by the modifications requisite to adapt the [prior art] * * * device to use in the ammunition counting field in the manner proposed." 87 F.2d at 489, 24 CCPA at 941. See In re Miller, 311 F.2d 955, 50 CCPA 885.

Closely related to the doctrine of nonanalogous art is the doctrine forbidding hindsight reconstruction, also discussed in *Potts*, supra. In applying section 103, the Supreme Court recently cautioned against "slipping into hindsight." Graham v. John Deere Co., 383 U.S. 1, 36, 86 S.Ct. 684, 15 L.Ed.2d 545; 148 USPQ 459, 474, citing Monroe Auto Equipment Co. v. Heckethorn Mfg. & Supply Co., 6 Cir., 332 F.2d 406, 412 (1964), cert. denied 379 U.S. 888, 85 S.Ct. 160, 13 L.Ed.2d 93. See In re Grout, supra.

In *Monroe Auto* the reference related to a brake cylinder and the invention concerned auxiliary suspension devices designed for installation on the rear of an automobile. The court cautioned against the use of hindsight, citing In re Sporck, 301 F.2d 686, 49 CCPA 1039. In this latter case we stated, section 103 "requires us to view the prior art without reading into that art the teachings of appellant's invention." In re Murray, 268 F.2d 226, 46 CCPA 905. The opinion in *Sporck* further provides, 301 F.2d at 689, 49 CCPA at 1043, 44, 45:

Once appellant's solution to the problem of making a tapered wall frusto-cone is disclosed, it is easy to see how the prior references can be

modified and manipulated to produce this type of cone. The change admittedly is simple and by hindsight seems obvious. However, the simplicity of new inventions is oftentimes the very thing that is not obvious before they are made. This court, in In re Osplack, 195 F.2d 921, 39 CCPA 932, stated:

> We think this case is one of that category of inventions which, when viewed after disclosure and explanation by an applicant, seem simple and such as should have been obvious to those in the field. Yet this does not necessarily negative invention or patentability. Goodyear Tire & Rubber Co., Inc. [et al.] v. Ray-O-Vac Co., 321 U.S. 275, 64 S.Ct. 593, 88 L.Ed. 721, In re DeLancey, 159 F.2d 737, 34 CCPA (Patents) 849. Indeed, simplicity may even be some evidence of invention. Baldwin-Southwark Corporation v. Tinius Olsen Testing Mach. Co. [et al.], 3 Cir., 88 F.2d 910.

The fact that the invention seems simple after it is made is not determinative of the question of obviousness. If this were the rule, many of the most beneficial patents would be stricken down. If those skilled in the mechanical arts are working in a given field and have failed to discover a certain new and useful improvement, the one who first makes the discovery frequently has done more than make an obvious improvement which would have suggested itself to a mechanic skilled in the art, and such an invention is entitled to the grant of a patent thereon. Expanded Metal Co. v. Bradford, 214 U.S. 366, 29 S.Ct. 652, 53 L.Ed. 1034.

\*　　\*　　\*　　\*　　\*　　\*

Here, neither the record nor the facts of which we are able to take judicial notice supplies the factual data necessary to support the legal conclusion of obviousness of the invention at the time it was made. We are unwilling to substitute speculation and hindsight appraisal of the prior art for such factual data. \* \* \*

The opinion in *Monroe Auto* also cautions, concerning the doctrine of nonanalogous art, that a reference may be used if it is "illustrative of the adaptation of well known scientific principles to practical uses," citing In re Mariani, 177 F.2d 293, 37 CCPA 740, 742. In this latter case the invention related to a juice extractor for, e. g., oranges, with an extensible handle and base member. The references related to a fishing reel with an extensible handle for increased leverage and an automobile jack with an extensible base. The opinion points out, in answer to the argument concerning nonanalogous art, 177 F.2d at 295, 37 CCPA at 742:

> It seems to us that appellant may have misunderstood the exact theory underlying the decisions of the respective tribunals of the Patent Office. We do not understand their rejection to be based simply upon the showing of the extensible feature of the fishing rod and the provision of a broader base for the automobile jack. Both tribunals seem to us to have held, in effect, that the features claimed to be novel are not in fact novel but are scientific necessities—or, at least, scientifically desirable and well known to those skilled in the art—and the particular patents were cited as being illustrative of the adaptation of well known scientific principles to practical uses.

It is interesting to note the Supreme Court in *Potts* made a similar observation, 155 U.S. at 605, 15 S.Ct. 194, 39 L.Ed. 275 in applying the nonanalogous art doctrine and upholding the validity of the patents in suit. See also Printing Plate Supply Co. v. Crescent Engraving Co., 246 F.Supp. 654, 662 (W.D.Mich. 1965).

With the above principles in mind, we are required to determine, from the factual bases of record, whether such bases

supports the legal conclusion of obviousness. We think they do not.

Appellants' invention is manifestly far removed from the art of manufacturing Japanese cutlery. Applying the test stated supra, in *Lobl*, it does not seem to us that one seeking to eliminate pump cavitation problems *and* the problem of vapor in cryogenic liquid propellant flow system would turn to the cutlery art.

The board in its opinion appears to agree as it acknowledges that the relationship between film boiling and insulating materials "appears to have subsequently been independently discovered by appellants." The solicitor also appears to agree as he maintains appellants should have consulted with "colleagues skilled in metallurgy."

It is of course true that the examiner was able to locate the Sato article. However, it appears that this was done through reading into the art the teachings of appellants' invention. In re Murray. We think the Patent Office's conclusion of obviousness is based on an impermissible hindsight reconstruction of the art. In re Sporck.

Our determination here is not without difficulty. However, we think the difficulty arises from not considering the subject matter as a whole and instead focusing on the scientific principle involved, namely, the reduction of film boiling through the use of an insulator. While one may not patent a principle, the application of a principle to an environment may result in a patentable invention. Tilghman v. Proctor, 102 U.S. 707, 26 L.Ed. 279 (1880).

Considering the facts of record we are of the view that appellants, in view of the conditions set forth in section 103, are not chargeable with the knowledge set forth in the cutlery art. Accordingly, the board's decision must be reversed.

Reversed.

WORLEY, C. J., did not participate.