**READING & BATES CONSTRUCTION COMPANY, Appellant,**

v.

**BAKER ENERGY RESOURCES COR-PORATION and Baker Marine Corporation, Appellee.**

**Appeal No. 84–527.**

United States Court of Appeals, Federal Circuit.

Nov. 15, 1984.

D. Dennis Allegretti, Allegretti, Newitt, Witcoff and McAndrews, Ltd., Chicago, Ill., argued for appellant. With him on the brief was Mark T. Banner, Chicago, Ill., Richard B. Warnke, Reading & Bates Const. Co., Tulsa, Ok., of counsel.

Charles De La Garza, Arnold, White & Durkee, of Houston, Tex., argued for appellee. With him on the brief was John F. Lynch, Houston.

Before RICH, KASHIWA, and SMITH, Circuit Judges.

RICH, Circuit Judge.

This appeal is from the September 8, 1983, judgment of the United States District Court for the Southern District of Texas, sitting without a jury, holding that U.S. patent No. 4,003,440 ('440) issued January 18, 1977, on the invention of Martin D. Cherrington (Cherrington) and subsequently assigned to appellant Reading & Bates Construction Company for "Apparatus and Process for Drilling Underground Arcuate Paths Utilizing Directional Drill and Following Liner" was invalid under 35 U.S.C. § 103. We *affirm*.

## Background

Reading & Bates Construction Company (Reading & Bates), a Texas Corporation in the pipeline construction business, which includes the placement of pipelines under rivers, sued Baker Energy Resources Corporation (Berco), also in the business of placing pipelines under rivers, for infringement of claim 10 of its '440 patent. Reading & Bates filed an amended complaint on November 19, 1983, expanding its allegations to include infringement of claims 1–6 and 10–13 of the '440 patent, and also to name Baker Marine Corporation (Baker Marine) as a party defendant. The defendants (collectively hereinafter Baker) answered, denying infringement, and counterclaimed seeking a declaration that the '440 patent was invalid, unenforceable and not infringed.

The patent in suit discloses and claims a method for installing pipelines under obstacles, such as rivers, by drilling a hole along an inverted arcuate path beneath the obstacle and then installing a pipeline in the previously drilled hole. The operation of the present invention in drilling along an inverted arcuate path is illustrated generally in Fig. 1 of the patent, reproduced below:

Fig. 1

An obstacle is illustrated by a river or water course 10 under which an arcuate hole is to be drilled along a desired path 18 (dashed line) from a first, or entry, position 12 on the surface of the ground on one side of the river 10 to a second, or completion, position 14 on the other side of the river. Initially, a pilot hole is drilled along path 18, by a directional drill 20. This directional drill consists of a mud motor and drill bit, (not shown) which is powered by a trailing drill string 22. The directional drill is referred to in the Jepsen format preamble to claim 6. A following liner 24, the claimed improvement in claim 6, extends from the entrance 12 of the drill hole to a position substantially behind the directional drill 20. Following liner 24 has a larger diameter than drill string 22 and fits circumferentially around the drill string within the hole. A specialized drilling rig is utilized which advances the directional drill 20 and the following liner 24 independently of each other. Thus, the following liner 24 can either follow the directional drill 20 simultaneously or sequentially.

The district court in its fact issue *"Conclusions"* 18, 19 and 20 set forth its view of the critical claim limitations. It held that the claims had been limited during prosecution to a process requiring: 1) the drilling of an arcuate path, and 2) utilizing a following liner which imparts no directional guidance to the directional drill but, rather, only follows it. The district court concluded that the "novel feature" of the '440 patent was "the iterative process— specifically, that the liner followed the drill

pipe in sequence during the drilling process" which "prevents key seating, knifing and columnar failure[,] provides a return for cuttings and protects the integrity of the hole in soft formations."

The district court opinion in its section entitled "Validity of the Patent" individually addressed the factual findings required by 35 U.S.C. § 103.

Most of Reading and Bates' brief is directed to two of the district court's findings of fact; (1) the relevant prior art, and (2) the scope of the prior art. In determining the claimed invention to have been obvious, the district court considered four prior art references which it found had not been disclosed to the Patent and Trademark Office (PTO) during prosecution. These references, which will be discussed seriatim, are: 1) The Smith brochure, 2) the Paone article, 3) the '514 patent, and 4) the '903 patent.

### Relevant Prior Art

The Smith brochure is a one-page promotional brochure advertising the use of a conventional non-directional drill for drilling an inverted arcuate path under a river. Directional boring and control is achieved by bending the housing of the drill near the drill bit and advancing the drill head while maintaining the position of the bend.

The Paone article is an 86 page study entitled, "Horizontal Boring Technology: A State-of-the-Art Study," which surveys conventional techniques for vertical drilling and the technology for controlled vertical drilling. The article also notes the poten-

tial application of vertical drilling techniques to horizontal drilling.

U.S. patent No. 2,948,514 ('514) entitled "Rotating Earth Drilling Apparatus and Method" discloses the vertical drilling of a hole by alternately advancing a drill head and its surrounding casing. The function of the casing is to provide support for the sides of the drill hole in alluvial formations.[1]

U.S. patent No. 3,878,903 ('903) entitled "Apparatus and Process for Drilling Underground Arcuate Paths," issued to Cherrington, the inventor named in the patent in suit, was pending in the PTO when the '440 application was filed. The district court found the process disclosed in the '903 patent "to constitute prior art in the preamble to claim 6 of the '440 patent," which is in Jepson format, and thus to be an admission that the '903 patent was a prior art reference for purposes of 35 U.S.C. § 103. Fig. 3 of the '903 patent, reproduced below, is representative:

FIG_3

It discloses drill string 48 having end 72 which attaches to the drill head casing 70. The drill is powered by drilling mud forced through the drill string 48. Drill head 70 has an angular bend 74 that can be varied up to 10° or more. The angular bend 74 controls the direction of the cutting portion 78 of drill bit 76. Cutting tip 78 has 3 rotors with a plurality of cutting teeth. Thus, the hole 82 dug by drill head 70 is curved along its length as a result of angular bend 74 in drill head casing 70.

The ability to control the angular direction of the drill path enables directional drilling to be used to drill nonvertical paths such as the inverted arcuate path claimed in the '440 patent.

The '903 patent is cross-referenced in the '440 specification to illustrate and teach an available directional drill device, and specifically, one upon which the invention of the '440 patent is asserted to be an improvement.

*Teachings of the Prior Art*

Reviewing the combined teachings of the '514 patent and the Paone article, the district court found that they disclose the nondirecting features of a casing to seal off the well bore from fluids in the surrounding foundations, and to protect the well bore from caving sidewall material. Moreover, it found that they had "been employed by the drilling industry for years."

**1.** An alluvial-type soil formation consists of clays, gravel, silt-stones, or other similar materials. It is sometimes referred to as a soft formation or as an unconsolidated formation.

The district court further found that when the '903 patent, which discloses directional drilling, was combined with the nondirecting feature of a casing, which it found well known in vertical drilling, there was "no difference between the claims of the process of the '440 patent, and the disclosures of the Paone article, the '903 patent, and the '514 patent...." In other words, the district court held that it would have been obvious to use a following liner in inverted arcuate path drilling, for the same purpose for which it had previously been employed in vertical drilling.

Based on these factual findings, the district court concluded that the patent was invalid for obviousness under 35 U.S.C. § 103.

## OPINION

### I. 35 U.S.C. § 282, Presumption of Validity

The district court in its Conclusion of Law 3, stated: "Where the PTO is unaware of relevant prior art, however, the presumption [of validity] is weakened...." While such statements have often been made, this court recently commented on this point in *American Hoist & Derrick Co. v. Sowa & Sons, Inc.*, 725 F.2d 1350, 1358–60, 220 USPQ 763, 770–71 (Fed.Cir. 1984), as follows:

> [N]ew prior art not before the PTO ... *has no effect on the presumption [of validity]* or on who has the burden of proof. They are static and in reality different expressions of the same thing—a single hurdle to be cleared. ... [The effect] of new prior art ... is to eliminate or at least reduce, the element of deference due the PTO, thereby partially, if not wholly, *discharging* the attacker's burden....
> ... That burden is constant and *never changes* and is to convince the court of invalidity by clear evidence. [Emphasis except "discharging" added.]

Thus, Baker has the burden to prove by clear and convincing evidence that the PTO was wrong in issuing the '440 patent. We review the district court's findings of fact in view of that construction of the presumption mandated by § 282.

### II. Admissions

The district court, in holding that the '903 patent is prior art found (finding of fact 13(c)) that it "is admitted to constitute prior art in the preamble to claim 6 of the '440 patent." Reading & Bates argues that:

> It is incorrect to state that the "process disclosed [in the '903 patent] is admitted to constitute prior art in the preamble to claim 6 of the '440 patent. Although claim 6 is written in *Jepson* format, its preamble contains no such admission, either expressly or impliedly. This case is controlled by the decision of the C.C.P.A. in *In re Ehrreich*, 590 F.2d 902, 200 U.S.P.Q. 504 (C.C.P.A.1979), in which, like the present instance, the patentee had a copending application on a related invention. Use of the *Jepson* format in *Ehrreich* was held *not* to be an admission that the patentee's own prior invention, disclosed in his copending application, was prior art. Rather, it was held to have been used to avoid a double patenting rejection....

> .     .     .     .     .

> To whatever extent the preamble of claim 6 may be an admission, it is *not* an admission that the '903 *patent* is "prior art" under 35 U.S.C. § 103. The '903 patent cannot be prior art with respect to the '440 patent as a matter of law. [Emphasis in original.]

We agree that this case is factually similar to *Ehrreich*. In both cases the patentee had a copending application on a related invention. While Reading & Bates does not allege, as did the patentee in *Ehrreich*, that the purpose of the Jepson format was to prevent a double patenting rejection, we find the policy behind the holding in *Ehrreich*, that the preamble, standing alone, was not an admission that one's own prior work is prior art, to be applicable here; "obviousness should not be based on an implied admission errone-

ously creating imaginary prior art. That is not the intent of § 103."

■ *In re Fout*, 675 F.2d 297, 213 USPQ 532 (CCPA 1982), also cited by Reading & Bates in its reply brief, further supports the policy behind requiring a statutory basis before one's own work may be considered as prior art. In *Fout*, the Jepson format was utilized to maintain a clear distinction from the prior art, namely, the Pagliaro process,[2] and Fout's claimed improvement which was directed to the last step of the Pagliaro process. The applicants did not dispute that the Pagliaro process, claimed in a copending application by a different inventive entity, was prior art to their invention and that they had knowledge of it before making their invention.

The PTO rejected Fout's claims under § 103, based primarily on the Pagliaro process as prior art. Fout appealed, asserting that the Pagliaro process was not prior art by virtue of any statute, and that the claim preamble

> is not an admission that said [Pagliaro] decaffeination process is "legally available as prior art against the claims," and that the PTO's position is in conflict with the decision of this court in *In re Ehrreich.* . . .

The CCPA affirmed the PTO's decision to accept the preamble as an admission of prior art and distinguished *Ehrreich* on the ground that the application was filed by a *common inventive entity*, stating in a footnote:

> However, as stated in *In re Ehrreich*, the preamble of a Jepson claim is *impliedly* admitted to be prior art. In that case, the implication was overcome by appellants' explanation that the Jepson format was used to avoid a double patenting rejection in *their own* copending case. Here, appellants argue that the Jepson format was used to maintain a clear line of demarcation between their invention and the invention claimed in the *commonly assigned* Pagliaro appli-

cation. Absent a statutory bar under 35 USC 102(b), (c), or (d), an applicant's own invention cannot be "prior art" to him. [Emphasis in original.]

... Appellants' assertion that there is no substantive distinction between the two situations is without merit.

The CCPA went on to state, "Claims must always be read in light of the specification. Here, the specification makes plain what appellants did and did not invent. . . ."

As expressed in *Fout* and *Ehrreich*, there is an important distinction between the situation where the inventor improves upon his own invention and the situation where he improves upon the invention of another. In the former situation, where the inventor continues to improve upon his own work product, his foundational work product should not, without a statutory basis, be treated as prior art solely because he admits knowledge of *his own work*. It is common sense that an inventor, regardless of an admission, has knowledge of his own work.

As stated in *Fout*, a statutory basis is required to support the loss of a once existing right to a patent. See, P.J. Federico, "Commentary on the New Patent Act," 35 USC 1, p. 18. There is no statutory basis for treating the recitation of the '903 patent invention in the preamble of the claims in issue as prior art. Under the circumstances of this case, it therefore cannot be considered to be prior art under § 103. The district court erred as a matter of law in holding that the preamble to claim 6 constitutes an admission that what it describes is prior art.

■ In addition to the district court's basis for holding the '903 patent to be prior art, Baker asserts that the section of the '440 specification entitled "Summary of the Prior Art," made reference to the method disclosed in the '903 patent. That portion of the specification reads as follows:

---

**2.** The Pagliaro process, an application which was prosecuted by the same counsel as the *Fout* application, was also the subject of a CCPA decision. *In re Pagliaro*, 210 USPQ 888, 657 F.2d 1219 (1981).

It has heretofore been unknown to use such overshoes [following liner] in drilling inverted arcuate paths underneath obstacles, as illustrated in my U.S.Pat. No. 3,878,903 for APPARATUS AND PROCESS FOR DRILLING UNDERGROUND ARCUATE PATHS. The purpose of the following liner in this context is to maintain the drilled hole and provide a second larger drill pipe to be used as a production casing or for subsequent reaming of the hole. Accordingly, the invention summarized hereafter is believed to radically distinguish from the known prior art.

Baker asserts this language constitutes an admission that the '903 patent is prior art citing *In re Nomiya*, 509 F.2d 566, 184 USPQ 607 (CCPA 1975). In *Nomiya*, the patentees, citizens and residents of Japan, filed a patent application containing two drawing figures labeled as prior art, and statements explanatory thereof. The figures referred to an invention of another in Japan which would not have been prior art by virtue of any sub-section of § 102. The CCPA, in nevertheless considering the thus described Japanese invention as prior art, stated:

> By filing an application containing Figs. 1 and 2, labeled prior art, ipsissimis verbis, and statements explanatory thereof appellants have conceded what is to be considered as prior art in determining obviousness of their improvement. [509 F.2d at 571, 184 USPQ at 611–12.]

*Nomiya* is distinguishable from the case at hand, on the same basis *Fout* was distinguished from *Ehrreich*—the existence of a *common inventive entity* as both the applicant for patent and the inventor of the alleged "prior art."

▮▮▮▮ Finally, Baker asserts that the attorney who prosecuted the '440 patent admitted that "the method disclosed in the '903 patent was published in the Smith

article [brochure] nearly two years before the '440 patent application was filed." The section of testimony relied upon is reproduced below: [3]

[Q] No. Let me proceed in this way if I might.

I am placing on the easel what has been marked as defendant's Exhibit 6. Now, this is a pipeline and gas journal article of December, 1972 explaining Mr. Cherrington's original process of drilling across a river, correct? [4]

A. Yes.

Q. And this is also the process set forth in the United States Patent 3,878,903.

A. Yes.

Q. Now, this particular article, defendant's Exhibit 6, and the '903 patent constitute prior art to the present patent, do they not?

A. Yes, as far as I am concerned, they do. As I explained on my deposition, I have to leave that to the points of briefing. But it is pretty clearly to me prior art.

Therefore, Baker asserts, based on the above "admission," that the '903 patent can be used as prior art under § 103.

While the prosecuting attorney admitted that the Smith brochure advertising *the process* set forth in the '903 patent is prior art, that is not the equivalent of an admission that the Smith brochure constitutes an enabling disclosure of the invention claimed in the '903 patent. For the *invention* of the '903 patent to be *described* in the Smith brochure, pursuant to § 102(b), the Smith brochure itself must enable someone to practice the invention of '903 patent. *Preemption Devices Inc. v. Minnesota Mining & Mfg. Co.*, 732 F.2d 903, 906, 221 USPQ 841, 843 (Fed.Cir.1984). It does not do that. The mere fact that the Smith brochure, a one-page promotional brochure, boasts the ability and results of the process

---

**3.** This testimony is from the direct examination of the attorney who prosecuted the patent in suit, by the attorney for Baker.

**4.** The *Pipeline and Gas Journal*, Exhibit 6 referred to, contains the same disclosure as the

Smith brochure which has not been included in the record before us. The parties treat the disclosures as the same, however, and we do the same, referring to them collectively as the Smith brochure.

of the '903 patent is insufficient, as a matter of law, to constitute an enabling disclosure of the process of the '903 patent.

The Smith brochure itself may qualify as a prior art *reference* under § 103, but only for what is disclosed in it. It cannot serve as the vehicle by which the '903 patent and the more detailed disclosure it contains may also be considered as prior art. Furthermore, the prosecuting attorney's erroneous admission that the '903 patent is § 103 prior art is not binding on the patentee. He was not the attorney in this litigation. He was speaking merely as a witness giving a personal opinion and not too sure of the legal correctness of what he was saying: "I have to leave that to the points of briefing," he said. It is for the court to say what does or does not qualify as § 103 "prior art" and the testimony of an attorney who prosecuted an application has no binding effect on this court, including the testimony of a patent attorney on a point of patent law.

## III. Scope and Content of the Prior Art

■ Reading & Bates alleges that

It is only with the use of hindsight that one of skill in the art would consider combining the references in the manner suggested by the defendants and then done by the district court.

We disagree. Though all four references relied on by the district court are in the art of conventional vertical drilling, they were correctly applied to the claimed invention of the '440 patent. We are unpersuaded by Reading & Bates' arguments and hold that the district court did not err in its evaluation of the prior art as a whole.

## IV. Obviousness

Reading & Bates alleges:

II. *It is wrong to assume that the sources of the problem in horizontal directional drilling over long distances were well known when, in fact, they were discovered by the inventor,* *which is part of his contributions to the art.* [Emphasis in original.]

.    .    .    .    .

Mr. Cherrington discerned that among the causes of the problems were friction, the tendency of the hole to "close", knifing and "key seating," and the lack of lubrication between the drill string and the hole. None of these causes of drill string deviation are suggested by the prior art.

The solution Mr. Cherrington discovered was the use of a following liner in directional drilling operations. While use of following liners was known in other drilling applications, such as to unstick a drill bit or to retrieve a broken drill bit, nowhere was it suggested that *the problem of directional deviation* was caused by these circumstances. [Emphasis in original.]

Baker counters:

To assert these problems were either unknown or went unsolved in the art is incredible in view of the evidence. To suggest that those skilled in the art did not know that these problems impede placing a drill string in a desired location ignores the reality of drilling: the purpose of which is to get from one point to another. To assert that those skilled in the art would not know that problems which inhibit their drilling inhibit them from getting their target point is ludicrous.

\*    \*    \*    \*    \*    \*

Thus there is not a scintilla of evidence in the record tending to indicate that Mr. Cherrington discovered the source of a problem that had long since been recognized.

[\* in original]

We agree with Baker that the same or similar problems are incurred in both vertical and horizontal directional drilling and that in horizontal drilling these problems affect the directionality of the drill path. Furthermore, Reading & Bates do not claim a liner which imparts directionality to the drill path. Rather, the prosecuting at-

torney, during prosecution, expressly stated that the purpose of the following liner was to enhance the structural integrity of the hole. This is evidenced by the following excerpt from the remarks in an amendment, by the prosecuting attorney, to a rejection of the claims by the examiner:

The invention is a following liner in conjunction with the drill. . . .

It is important to note that the following liner does not impart directionality to the drill. Specifically, the following liner preserves the hole. The directional drill makes and *directs* the hole. The liner only follows. [Emphasis in original.]

■ Based on this representation, the district court noted that Cherrington's use of a following liner was nothing more than "the reapplication of known processes and drilling techniques to a new problem," and in this case would have been obvious. Thus, the sole asserted purpose of the following liner was found by the district court to be well known in the art, i.e., to provide structural integrity to the hole. We are not convinced that Cherrington, so far as the *claimed* invention is concerned, discovered any problems not previously well known in the art. Nowhere in the patent does Cherrington assert improved control and accuracy resulting from the claimed invention. Without this advantage, the casing only functions traditionally to preserve the hole. Reading & Bates therefore cannot rely on this feature to distinguish the Cherrington device from the prior art. Accordingly, the district court did not err as a matter of law in holding that this "permutation" on the state of the art produced a process which would have been obvious to one of ordinary skill in the art.

■ Finally, while Reading & Bates has pointed to numerous unfortunate expressions in the district court's discussion of § 103, we find them insufficient to constitute reversible error. Our main concern is with the correctness of the decision of the court below, not its mode of expression in its opinion. *Medtronic, Inc. v. Cardiac Pacemaker, Inc.*, 721 F.2d 1563, 220 USPQ 97 (Fed.Cir.1983).

The decision of the district court holding the '440 patent invalid for obviousness is *affirmed.*

AFFIRMED.